Upon review of all the competent evidence of record with reference to the errors assigned, and finding no good ground to reconsider the evidence, receive further evidence, or to rehear the parties or their representatives, the Full Commission AFFIRMS and ADOPTS the Opinion and Award of the deputy commissioner with minor modifications as follows:
 The Full Commission finds as facts and concludes as matters of law the following which were entered into by the parties at the hearing before the deputy commissioner as:
 STIPULATIONS
1. At the time of the incident giving rise to this claim, the parties were bound by and subject to the provisions of the North Carolina Workers Compensation Act with the defendant-employer employing three or more persons.
2. At the time of the incident giving rise to this claim, an employer-employee relationship existed between the parties.
3. Plaintiffs average weekly wage at the time of the incident giving rise to this claim was $266.07.
4. At all times relevant to this claim, defendant-employer was self-insured.
5. The date of the incident giving rise to this claim was February 16, 1995.
6. Temporary total disability compensation was paid to plaintiff from February 17, 1995 until May 4, 1997.
7. Without need for further authentication or verification, the records from the following medical providers were stipulated into evidence:
William F. Credle, Jr., M.D. (17 pages);
Paul C. Whitesides, Jr., M.D. (2 pages);
David W. Puett, M.D. (12 pages);
S. Susan Torres, M.D. (25 pages);
Dennis J. Darcey, M.D. (4 pages);
Christy L. Jones, Ph. D. (5 pages);
Byron Ley, M.D. (5 pages);
MHC (15 pages);
Michael J. Barri, M.D. (14 pages);
Williams Kerns II, M.D. (3 pages);
New Hanover Regional Medical Center (34 pages); and
Cape Fear Memorial Hospital (1 page).
 ***********
The parties entered into a Form 21 Agreement for Compensation for Disability dated April 5, 1995, which indicated plaintiff suffered an injury by accident on February 16, 1995 resulting in shortness of breath, headaches, vision problems and chest problems. This agreement indicated that plaintiff earned an average weekly wage of $266.07, yielding a compensation rate of $177.38 and undertaking to pay plaintiff at that rate beginning on February 17, 1995 and continuing for necessary weeks. The Form 21 Agreement was approved by the Industrial Commission on May 17, 1995, and therefore, constitutes an Award of the Commission.
 ***********
Based upon the competent evidence of record herein, the Full Commission adopts the Findings of Fact of the deputy commissioner and finds as follows:
 FINDINGS OF FACT
1. At the time of the hearing in this matter, plaintiff was a 44 year old female who had completed the twelfth grade and taken a child psychology and an industrial business course thereafter. Prior to plaintiffs employment with defendant-employer, plaintiff worked with the civil service for ten years as a supervisor for transportation, packing and receiving. On February 16, 1995, plaintiff was employed at Myrtle Grove Middle School and had a second job at Cedar Cove Retirement Home.
2. On February 16, 1995, plaintiff was performing her usual duties as a custodian for Myrtle Grove Middle School, when she was instructed to clean one of the bathrooms and remove graffiti written over five of the bathroom stalls. Plaintiff was given an aerosol spray product, Allstar Vandalism Mark Remover, to remove the graffiti. One of the chemicals contained in the solvent is Tulane. Plaintiff used this material in the bathroom for approximately one hour. The area was not well ventilated. The plaintiff noticed that the fumes were strong from the mark remover and went out of the bathroom for a while for a breath of air. Thereafter, plaintiff finished her duties.
3. During that night, plaintiff had a severe headache and the next morning she woke up wheezing and having difficulty breathing. Plaintiff felt that her vision was blurred and went to the emergency room on February 17, 1995 for these problems.
4. Thereafter, plaintiff went to Dr. Paul Whitesides, the physician who treated her for her pre-existing diabetes. Dr. Whitesides referred plaintiff to Dr. Credle for respiratory problems, and authorized plaintiff to be out of work from the time he saw her until Dr. Credle took over her care on March 1, 1995. Plaintiff was thereafter treated by Dr. Credle for her pulmonary complaints, but on May 30, 1995, was released from a pulmonary standpoint to return to work without restrictions as she did not have any significant pulmonary abnormalities. Dr. Credle referred plaintiff to a rheumatologist, Dr. David Puett, on April 20, 1995 for diffuse pain. After Dr. Puett was unable to determine the etiology of plaintiffs diffuse pain, he continued to keep plaintiff out of work and referred her to Dr. Susan Torres on May 23, 1995.
5. Plaintiff presented to Dr. Torres on May 23, 1995, complaining of tingling in her feet, soreness of her hands, chest tightness, shortness of breath, swollen hands, low back pain, hip pain, hair falling out, tired all the time, fatigue, malaise, skin conditions, loss of energy, daily headaches, weight gain, memory problems, sleep difficulty and problems breathing. Plaintiff was diagnosed by Dr. Torres as possibly suffering from peripheral neuropathy, which might or might not be related to her chemical exposure. On May 31, 1996, plaintiff underwent nerve conduction and EMG studies, which showed a very mild demyelinating motor sensory neuropathy. Thereafter, plaintiff underwent blood and urine tests, which revealed that plaintiffs diabetes was not under good control. Dr. Torres is an expert in Toulane exposure and on September 14, 1995, referred plaintiff to Dr. Dennis Darcey, a specialist in Toulene toxicity with Duke Universitys Occupational Health Service. Dr. Darcey was of the opinion that while plaintiffs acute symptomatology would be consistent with her exposure to the Allstar Vandalism Mark Remover product and that the substance could cause respiratory irritation at high concentrations and hoarseness as well as dizziness and headache, the chronic effects of an exposure such as plaintiffs would not be anticipated. It is unlikely that plaintiffs other symptoms are directly associated with her exposure to the product.
6. When plaintiff continued to complain of depression, cognitive difficulties, behavior changes and memory problems, Dr. Torres referred plaintiff to Dr. Christy L. Jones, a clinical neuropsychiatrist. Plaintiff initially saw Dr. Jones on July 20, 1995. After an extensive interview and MMPI, Dr. Jones was of the opinion that plaintiff had a strong functional overlay and any symptoms which she might be experiencing were extremely exaggerated. Plaintiffs MMPI was not valid because plaintiff was malingering and the results were inconsistent with plaintiffs conversational abilities. Plaintiffs performance on the MMPI would indicate that she was mentally retarded, however, plaintiff did not behave as mentally retarded in her interview or with her doctors nor did she appear to be mentally retarded at the hearing.
7. In August 1995 and on October 17, 1995, plaintiff was told by Dr. Torres that she was able to return to work with no restrictions and that she was no longer disabled from working. Plaintiff and her family were very upset by this opinion and contacted Dr. Puetts office on September 7, 1995 and December 1, 1995, questioning whether he had been in contact with Dr. Torres and requesting copies of plaintiffs file. Plaintiffs family was also very involved in her examination by Dr. Jones and that seemed to increase plaintiffs stress.
8. Dr. Byron Ley also treated plaintiff for diabetes with which she was diagnosed in 1993. Plaintiff began taking oral insulin in June 1994. By April 1995, plaintiff began taking insulin by injection. Plaintiff has multiple family members who have had bad outcomes from diabetes. Dr. Ley suspected a functional overlay to plaintiffs complaints. Dr. Ley was of the opinion that plaintiffs diabetes was not under control.
9. As plaintiff appeared to have a mild neuropathy, Dr. Torres was of the opinion that it was most likely from diabetes but indicated that a nerve biopsy could be performed. This nerve biopsy was not performed. There is a very small chance that a nerve biopsy would have been helpful in determining the cause of plaintiffs neuropathy.
10. In December 1996, plaintiffs records were reviewed by Dr. Williams Kerns of the Division of Toxicology at the Carolinas Medical Center in Charlotte. Dr. Kerns was of the opinion that plaintiffs initial symptoms of headache and bronchospasm were consistent with an acute solvent exposure; however, a brief exposure such as the plaintiffs to this solvent is not consistent with the chronic peripheral neuropathy from which plaintiff suffers. Peripheral neuropathy occurs with chronic and continued exposure. Dr. Kerns was also of the opinion that it is extremely unlikely that plaintiffs symptoms, other than headache and bronchospasm, were related to her exposure to the solvent; that the solvent to which plaintiff was exposed is not known to cause insulin dependent diabetes; that plaintiffs chronic complaints of depression, neuropathy, dizziness and fatigue were not directly related to her solvent exposure; and, that after plaintiffs extensive evaluations and medical consultations from a pulmonologist, rheumotologist, neurologist and clinical neuropsychiatrist, as well as evaluations for rheumatoid arthritis, lupus and lyme disease, and neurological evaluations including a negative lumbar puncture, negative EEG, negative MRI and positive tests for mild demyelinating peripheral neuropathy, as well as an evaluation by the Duke University Occupational Medicine Center, that it was unnecessary for the plaintiff to be seen by him.
11. Defendant-employer sent plaintiff a letter dated December 14, 1995, indicating that based upon Dr. Torres determination that plaintiff was able to return to work without restrictions, she was to report to work on January 2, 1996. Plaintiff sent a letter, received by defendant- employer on January 2, 1996, requesting an indefinite leave of absence due to health reasons. On January 9, 1996, plaintiff was sent a letter from defendant-employer indicating that since she was instructed to return to work because of her release to return to work without restrictions and as a result of her failure to do so, the director of personnel recommended that plaintiffs employment with defendant-employer be terminated. On January 24, 1996, plaintiff was sent a letter indicating that her employment with defendant-employer would be terminated effective February 2, 1996. Thereafter, plaintiff never returned to work. Defendant-employer filed a Form 24 Application to Terminate Compensation which was received by the Industrial Commission on March 6, 1997. On May 19, 1997, an Administrative Decision and Order was entered approving the defendants application and allowing defendant to terminate payment of compensation to plaintiff effective February 13, 1997.
12. Plaintiff has been followed by a pulmonologist who determined that plaintiff did not have any significant pulmonary abnormalities. While there is evidence that plaintiffs initial pulmonary problems and headache problems were caused by her exposure to Vandalism Mark Remover, there is no evidence that the symptoms from which she continues to complain, especially peripheral neuropathy and insulin dependent diabetes, are caused by her chemical exposure. Plaintiff continues to exaggerate her symptoms to the point that a valid evaluation is not possible.
13. The depression from which plaintiff suffers and which has allegedly disabled her from working, did not result from her employment with defendant-employer. Furthermore, plaintiffs diabetes or conditions related to her diabetes were not caused or aggravated by her injury by accident with defendant-employer.
14. There is no evidence that plaintiffs depression has disabled her from working and she has not been excused from work by any doctor for her depression.
15. Plaintiff has not been excused from work by any doctor for any reason, since Dr. Torres released her to return to work without restrictions on October 17, 1995.
16. Plaintiffs minimal exposure to Vandalism Mark Remover is not consistent with the depth, extent and longevity of the symptoms of which she complains.
17. Defendant has proven by the greater weight of the evidence that the symptoms from which plaintiff claims to suffer and which have allegedly disabled her from working after February 2, 1996 did not result from her employment with defendant-employer.
 ***********
Based on the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On February 16, 1995, plaintiff suffered an injury by accident arising out of and in the course of her employment with defendant-employer. N.C. Gen. Stat. 97-2(6).
2. Defendant has carried its burden that the conditions for which liability has been admitted and resultant complaints were acute in nature and not chronic. Therefore, plaintiffs subsequent chronic complaints are not related to the injury by accident.
3. Based on the greater weight of the evidence, any disability plaintiff may suffer due to mild peripheral neuropathy, depression and diabetes is not a direct and proximate result of her compensable injury by accident arising out of and in the course of her employment with defendant- employer on February 16, 1995. N.C. Gen. Stat. 97-1 et. seq.
4. The plaintiff is entitled to have the defendant pay all medical expenses arising from her compensable injury for so long as such evaluations, treatments and examinations may reasonably be required to effect a cure, give relief and/or lessen plaintiffs period of disability. N.C. Gen. Stat. 97-2(19), and 25.
5. Plaintiffs claim for additional compensation based on her inability to work is not compensable under the provisions of the North Carolina Workers Compensation Act.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Under the law, plaintiffs claim for additional indemnity compensation must be and the same is, DENIED.
2. The defendant shall pay all medical expenses incurred as a result of plaintiffs compensable injury when bills for the same have been properly submitted to defendant and approved according to procedures adopted by the Commission for so long as such evaluations, treatments and examinations may reasonably be required to effect a cure, give relief and/or lessen plaintiffs period of disability.
3. Each side shall bear its own costs; however, an expert witness fee is approved in the amount of $250.00 for Dr. Susan Torres and $540.00 is approved for Dr. Christy L. Jones.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/_______________ DIANNE C. SELLERS COMMISSIONER
S/_______________ CHRISTOPHER SCOTT COMMISSIONER
BSB:md